# United States Court of Appeals
## For the First Circuit

No. 23-1975

UNITED STATES,

Appellee,

v.

ARNALDO J. IRIZARRY-IRIZARRY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Montecalvo, Circuit Judges.

Julie K. Connolly, with whom Julie Connolly Law, PLLC, was on brief, for appellant.
Brendan B. Gants, Attorney, Appellate Section, Criminal Division, United States Department of Justice, with whom W. Stephen Muldrow, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, and Matthew R. Galeotti, Supervisory Official, were on brief, for appellee.

July 24, 2026

**MONTECALVO, Circuit Judge.** Defendant-Appellant Arnaldo Irizarry-Irizarry ("Irizarry") appeals his jury conviction for wire fraud, conspiracy to commit wire fraud, and money laundering arising from his involvement in a scheme to defraud the Municipality of Mayagüez ("Mayagüez") and its municipal enterprise, Mayagüez Economic Development, Inc. ("MEDI"). Irizarry argues that the evidence presented at his trial was insufficient to establish that he had the intent required to commit the crimes underlying his convictions. He also appeals the district court's denial of his pro se motion to reduce his sentence under 18 U.S.C. § 3582. Because we conclude that there was no error in Irizarry's conviction and that he did not file a notice of appeal as to the district court's order on his pro se motion, we affirm his conviction and dismiss his sentencing challenge.

## I. Facts[1]

As a lawyer, Irizarry served as a legal advisor to Mayagüez and its mayor, José Guillermo Rodríguez Rodríguez ("Mayor Rodríguez"). In 2014, Mayagüez's municipal legislature authorized Mayagüez to create MEDI, a legally-independent, for-profit

---

[1] Irizarry's sufficiency-of-the-evidence challenge requires us to examine the facts in the light most favorable to the verdict and assess if that evidence, "including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged count or crime." United States v. Díaz-Rosado, 857 F.3d 116, 120 (1st Cir. 2017) (quoting United States v. Cruz-Díaz, 550 F.3d 169, 172 n.3 (1st Cir. 2008)).

corporation, to promote regional economic development and generate income for Mayagüez. Separately, between July 2012 and July 2015, Puerto Rico's legislature approved three multi-million-dollar awards to Mayagüez for renovations on and improvements to its trauma center. By March 2016, one of Mayagüez's bank accounts held $9 million -- most of which was traceable to the funds awarded for renovations to the trauma center.[2] After learning about the $9 million, Roberto Mejill-Tellado ("Mejill") and Eugenio García-Jiménez ("García") -- financial consultants for Mayagüez -- arranged a meeting to discuss the funds with Mayor Rodríguez. At the meeting, García proposed investing the $9 million in order to produce interest income to benefit Mayagüez and its trauma center and proposed that the principal would be returned to Mayagüez after generating interest. Mayor Rodríguez approved García's proposal. But, unbeknownst to Mayor Rodríguez, García had different plans for the $9 million in Mayagüez's bank account.

On March 9, 2016, García asked his friend Stephen Kirkland to prepare a fraudulent letter from UnionBanc Investment

---

[2] Pursuant to the trauma center renovation awards, Mayagüez's 1First Bank account received deposits totaling $8,761,839 between 2014 and 2016. On March 11, 2016, Mayagüez's Banco Popular de Puerto Rico account deposited a $14.6 million check issued from the 1First Bank Account. The parties stipulated that on March 29, 2016, Mayagüez had $9 million in its Banco Popular account, which is the amount represented at trial as being reserved for the trauma center.

Services ("UBIS") offering MEDI investment services. Stephen prepared the letter, which included the forged signature of his brother Joseph Kirkland,[3] a UBIS financial advisor. The same day, García and Joseph applied to open a UBIS investment account ("UBIS account") under MEDI's name. After the UBIS account opened, $9 million was transferred from Mayagüez's bank account to the UBIS account on March 29, 2016. Joseph then used the $9 million to purchase U.S. Treasury bonds, which were used as collateral for a line of credit, in turn allowing cash transfers out of the account.

In April 2016, more than $4 million was wired from the UBIS account to entities that García or Mejill owned. By the end of April, UBIS personnel, after flagging the UBIS account's suspicious activity, decided to close the account. García and Joseph transferred the remaining funds (around $5 million) to an LPL Financial account belonging to Mayagüez Economic Development Financial Strategies ("MEDFS"), a separate corporation García created and operated.

More than $3 million was transferred out of the LPL Financial account between late June 2016 and early July 2016. García returned $1.8 million to Mayagüez's bank account to conceal the scheme, falsely asserting that the amount was an advance

---

[3] We refer to Stephen Kirkland and Joseph Kirkland by their first names for clarity.

interest payment. Overall, the funds transferred from MEDI's UnionBanc account and MEDFS's LPL Financial account were transferred into and out of over twenty different bank accounts that the coconspirators held through various corporate entities. Three of those entities were: (1) TEGA Holdings, LLC ("TEGA"), which García and Mejill co-owned; (2) U.A. United Advisors Corporation ("U.A."), which Irizarry owned and incorporated in March 2016; and (3) IManagement, LLC ("IManagement"), which was incorporated in March 2016 and operated by MEDI Executive Director Alejandro Riera-Fernández ("Riera").[4]

With coconspirator Steve Minger's help, García and Mejill had opened a bank account for TEGA in the United States mainland, which received a $900,000 wire from the MEDI UBIS account on April 4, 2016. And between April 2016 to December 2016, TEGA transferred $126,100 to U.A. and $133,200 to IManagement. Both U.A. and IManagement received a $90,000 wire transfer on April 6, 2016, a $9,000 wire transfer on July 18, 2016, and multiple checks between August 2016 and December 2016. Through their respective

---

[4] Roberto Santiago-Velázquez incorporated IManagement as a favor to Riera, who indicated -- without explanation -- that he could not incorporate IManagement in his own name. Thus, Santiago-Velázquez was listed as IManagement's President and owner and signed checks and documents on the corporation's behalf. But other than those acts, Santiago-Velázquez did not perform any work for IManagement or see any of its actual work product. Rather, Mejill understood IManagement to be Riera's company because Riera ensured IManagement's invoices were submitted to TEGA and picked up the corresponding checks.

entities, Irizarry and Riera sent invoices to TEGA to document each of these payments. Irizarry's invoices each contained the exact same description for the "professional services rendered," stating: "[c]onsultancy and advisory services regarding corporate development and financial and banking investments" and "[a]dvisory services regarding corporate transactions between different private investors and entrepreneurs."[5] Similarly, Riera's invoices each contained similar descriptions of the "services rendered" by IManagement. Neither Irizarry nor Riera's invoices provided specific dates or hours for the services they purportedly rendered. Mejill paid these invoices at García's direction, though he testified at trial that he knew the services described in the invoices were not provided. Irizarry used part of the money transferred to U.A. to pay off a personal car loan and to purchase another car for himself.

The same year TEGA made these payments to U.A. and IManagement, Irizarry, García, Mejill, and Riera held private meetings together. Irizarry also frequently met García in private. Additionally, Irizarry, García, Mejill, and Riera regularly attended MEDI's board meetings -- Riera attending as MEDI's Executive Director and the other three men attending as

---

[5] Irizarry testified that the U.A. invoices to TEGA represented the retainer fee García owed Irizarry for providing legal services to García's financial brokerage business.

consultants to either Mayagüez or MEDI. At those meetings, the four men never mentioned the $9 million MEDI received for investment from the Mayagüez bank account containing funds for renovation of the Mayagüez trauma center.

In fall 2016, auditors reviewing Mayagüez's bank account statements began inquiring about the $9 million outgoing transfer and the account's receipt of the $1.8 million "alleged interest" payment. The auditors wanted to know the nature of the $9 million transaction and where those funds were transferred so that they could make the correct entries in Mayagüez's financial statements. Accordingly, in the following weeks, the auditors held multiple meetings to discuss and gather information about the transactions. Irizarry attended at least one of those meetings. At a meeting Irizarry attended, which occurred in October 2016, he told the auditors that the $9 million transaction was legal. He expressed that the auditors "didn't really have to do anything" since the $9 million, by virtue of being in an account belonging to MEDI, was still in an account belonging to Mayagüez.

However, an auditor informed Irizarry that the $9 million could not be used for investing because the legislature specifically allocated those funds for Mayagüez's trauma center and, thus, the funds were considered restricted for that purpose only. The auditor recommended that the funds be returned to the proper municipal account, warning that if the comptroller's office

reviewed the $9 million outgoing transfer it could make a "major finding."[6]  Irizarry rebuked the recommendation to return the funds, insisting that corrective action was not needed and that the transactions were legal and for Mayagüez's benefit.

Over the course of the meetings, Irizarry, García, Mejill, and Riera represented to the auditors that the $9 million was invested for Mayagüez's benefit and the $1.8 million returned to Mayagüez's account was an advance interest payment.  Yet despite the auditors' prodding, none of the men provided specific information or documentation as to where the $9 million was invested or the type of investment made.  Thus, after three meetings, in which the four men provided very little useful information about the $9 million transaction, the auditors ceased their inquiry into the matter and made the necessary adjustments to Mayagüez's financial statements.

In 2018, the FBI began investigating what happened to the $9 million.  During that investigation, FBI Special Agent Daniel Crecelius interviewed Irizarry and Riera several times.  Agent Crecelius testified that Irizarry stated: (1) Mayagüez should have been the sole benefactor of the $9 million; (2) the payments to his company, U.A., were related to the "investment" of the $9 million; (3) he had not performed any work to justify the

---

[6] It is unclear from the auditor's testimony, or the record as a whole, what a "major finding" means or entails.

payments to U.A.; (4) at García's direction, he fabricated invoices to justify the payments to U.A.; and (5) he used the money paid to U.A. for personal expenses. As for his interviews with Riera, Agent Crecelius testified that Riera explained that: (1) IManagement was created after García or Mejill asked him to incorporate a company so they could facilitate payments to him; (2) IManagement did not perform work in exchange for these payments; and (3) he used the money for personal expenses.

## II. Procedural History

On March 22, 2021, a federal grand jury in Puerto Rico returned a thirty-three-count indictment against Irizarry, García, Mejill, Riera, Minger, and Joseph and Stephen Kirkland. Irizarry was indicted on four counts: (1) conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343, 1349 (Count One); (2) wire fraud, in violation of 18 U.S.C. § 1343 (Counts Seven and Seventeen); and (3) money laundering, in violation of 18 U.S.C. § 1957 (Count Thirty). The other defendants were similarly indicted on Count One, the conspiracy charge, and on wire fraud and money laundering counts.[7]

Irizarry and Riera were tried jointly in an eight-day jury trial, while the other five defendants pled guilty to certain counts in the indictment pursuant to their respective plea

---

[7] Joseph was not charged with money laundering.

agreements. At the close of the government's case, Irizarry filed a motion for judgment of acquittal on all counts based on insufficient evidence, which the district court denied. He renewed his motion at the close of evidence, which also was denied. Ultimately, the jury found Irizarry guilty on all counts leveled against him. The district court sentenced him to thirty-seven months' imprisonment followed by three years' supervised release. Irizarry timely appealed his conviction. While this appeal was pending, Irizarry filed a pro se motion for sentence reduction before the district court, which was denied. He also raises that denial on appeal.

## III. Discussion

Irizarry contests his convictions because they were based on insufficient evidence. Additionally, he claims the district court was wrong to deny his motion for a sentence reduction under 18 U.S.C. § 3582(c)(2). We address each in turn.

### A. Sufficiency of the Evidence

Before we dive into the merits, we note that Irizarry's sufficiency arguments as to the substantive counts -- wire fraud and money laundering -- derive from his sufficiency challenge to the conspiracy count. Specifically, he contends that because the evidence was insufficient to prove that he knowingly and intentionally participated in the wire fraud conspiracy, "no rational jury could conclude that [he] committed the wire fraud or

the money laundering that were the objects of the conspiracy." Accordingly, we begin, and end, with assessing whether the evidence at trial was sufficient to support Irizarry's conspiracy conviction on Count One.

Turning to Count One, the indictment charged Irizarry, García, Mejill, Riera, Stephen, Joseph, and Minger with conspiring to defraud Mayagüez and MEDI by depriving those entities of their money and property through "false and fraudulent pretenses, representations[,] and promises."  Irizarry contends there was insufficient evidence that he knew about and agreed to participate in the single, "overarching, multiple-crime conspiracy" to defraud Mayagüez and MEDI, because the evidence at trial failed to show the requisite interdependence and overlap -- factors we will detail later -- between him and the other coconspirators charged under Count One.  He reasons that the evidence did not show he knew Minger, Stephen, or Joseph or their roles and actions to implement the fraud scheme, "what Mejill or Riera had agreed to do with García," or that the payments from García to U.A. depended on the other coconspirators' actions.  Therefore, he asserts that the jury's verdict must have been "based on a variance between the conspiracy charged and the conspiracy proven."  And he requests his convictions be vacated on the grounds that the claimed variance was prejudicial.

The government responds that there was ample evidence

that Irizarry knowingly participated in the charged conspiracy and that his arguments to the contrary contravene our conspiracy precedent indicating that a single conspiracy's existence "does not require the participants to know of all the other participants, understand all the details of the conspiracy, or participate in each aspect of the conspiracy." See United States v. Ortiz-Islas, 829 F.3d 19, 24-25 (1st Cir. 2016) (quoting United States v. Dellosantos, 649 F.3d 109, 118 (1st Cir. 2011)). Further, the government contends that Irizarry's prejudicial variance arguments are "unpreserved and meritless" and asserts that, even if a variance existed, Irizarry has failed to show it was prejudicial to his "substantial rights."

We review preserved sufficiency of the evidence claims de novo, examining the evidence "in the light most favorable to the [verdict] and decid[ing] whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged count or crime." See United States v. Díaz-Rosado, 857 F.3d 116, 120 (1st Cir. 2017) (quoting United States v. Cruz-Díaz, 550 F.3d 169, 172 n.3 (1st Cir. 2008)).

We must preface our analysis of Irizarry's sufficiency claims with some conspiracy principles. To convict Irizarry of conspiracy to commit wire fraud, the government had to provide sufficient evidence that there was an agreement to accomplish an

unlawful objective and that Irizarry was a knowing participant in that agreement.  See United States v. Falcón-Nieves, 79 F.4th 116, 132 (1st Cir. 2023).  Further, to establish conspiracy, two types of intent must be shown: (1) intent to agree and (2) intent to commit the substantive offense, i.e., wire fraud.  Id.

When, as here, we must determine whether the evidence was sufficient to prove that a set of criminal activities constituted a single conspiracy, three factors guide our inquiry: "(1) the existence of a common goal among the alleged participants in the charged conspiracy, (2) interdependence among the alleged participants in the charged conspiracy, and (3) overlap among the alleged participants in the charged conspiracy."  United States v. Vavic, 139 F.4th 1, 31 (1st Cir. 2025) (citation modified) (quoting United States v. Abdelaziz, 68 F.4th 1, 42 (1st Cir. 2023)).  And, as the government points out, when analyzing these three factors, "we must remember" that a single conspiracy's existence "does not require the participants to know of all the other participants, understand all the details of the conspiracy, or participate in each aspect of the conspiracy."  Ortiz-Islas, 829 F.3d at 24-25 (quoting Dellosantos, 649 F.3d at 118).  Irizarry concedes that the government's evidence was sufficient to establish the first factor -- common goal -- but, as we noted above, he contends that the evidence was insufficient to satisfy the second and third factors of interdependence and overlap.

- 13 -

Thus, we center our analysis on those two factors.

We begin with interdependence, which focuses on whether "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." Dellosantos, 649 F.3d at 117 (quoting United States v. Mangual-Santiago, 562 F.3d 411, 422 (1st Cir. 2009)). "Interdependence may be shown where one participant knows that his own success depends on the continued existence and health of the [unlawful] organization as a whole." United States v. Niemi, 579 F.3d 123, 127 (1st Cir. 2009); see United States v. Mubayyid, 658 F.3d 35, 58 (1st Cir. 2011).

Here, Irizarry argues that the interdependence factor is not satisfied because there was no evidence that he did anything necessary for or advantageous to the wire fraud scheme that, he contends, the other conspirators agreed to commit. He also asserts that there was no evidence that he knew that the money he received from TEGA depended on the actions that the conspirators -- other than García -- took to implement the scheme. The government counters that Irizarry's conduct was advantageous to the success of the scheme because his efforts to persuade the Mayagüez auditors that the financial transactions involving the Mayagüez bank account were legal were designed to "stave off efforts to claw back the diverted funds" and "allow[ed] the conspirators to continue distributing and using those funds."

- 14 -

Irizarry's arguments do not convince us. To start, there was sufficient evidence for a reasonable jury to find that Irizarry knew his success "depend[ed] on the continued existence and health of the [unlawful] organization as a whole." Niemi, 579 F.3d at 127. Specifically, the trial evidence showed that Irizarry, along with García, Mejill, and Riera, made efforts to convince the Mayagüez auditors that: (1) the $9 million transaction was legal; (2) the funds did not need to be returned to Mayagüez's bank account; and (3) the auditors did not need to take any action. Irizarry made these representations even though, per Agent Crecelius's testimony, he knew that the payments made to his company, U.A., originated from the "investment" of the $9 million and that Mayagüez should have been the sole benefactor of the $9 million. Thus, a reasonable jury could infer, from Irizarry's efforts to conceal from the auditors precisely those activities that were likely to reveal the impropriety of the $9 million transaction, that he knew his success in receiving and retaining the funds illicitly procured from Mayagüez's bank account depended on the "continued existence and health of the [unlawful] organization as a whole." Niemi, 579 F.3d at 127.

In addition to supporting the finding that he depended on the fraud scheme's continued existence, the evidence of Irizarry's efforts to conceal the scheme's discovery from the auditors also supports a reasonable jury's finding that his actions

- 15 -

were advantageous to the scheme. As we explained, the evidence showed that Irizarry joined García, Mejill, and Riera's efforts in stonewalling the Mayagüez auditors from receiving any information necessary for them to discern the true nature of the $9 million transaction. And such efforts helped ward off the auditors, who -- while not necessarily convinced of the $9 million transaction's propriety -- ended their inquiry into the matter after the three unfruitful meetings and settled on making accounting adjustments without the information they sought. Protecting the scheme from being uncovered, in turn, enabled the coconspirators' continued disbursement and use of the $9 million.

That said, Irizarry retorts that his statements to the auditors were not advantageous to the scheme because they did not "stave off their investigation," "dissuade them from concluding that the [$9 million] had been improperly taken," or permit the coconspirators' continued disbursement of the $9 million, since, he attests, those funds had been completely disbursed by the time he first met with auditors in October 2016. But as we explained, while Irizarry's statements did not convince the auditors of the $9 million transaction's propriety, it did "stave off" their investigation, and Irizarry has not cited to any portion of the record illustrating the contrary. Further, the record belies his contention that the coconspirators did not continue to receive disbursements traceable to the $9 million in the period after the

- 16 -

October 2016 meeting with the Mayagüez auditors.  For instance, U.A. and IManagement received monthly checks from TEGA, the company that siphoned $900,000 from Mayagüez's $9 million, between October 2016 to December 2016.

Accordingly, because the evidence, which we view in the light most favorable to the verdict, sufficed to illustrate how Irizarry's activities were dependent on and advantageous to the overarching scheme to defraud Mayagüez and MEDI, a reasonable jury could have concluded that interdependence existed in the charged conspiracy.

Next, we address overlap, which may be satisfied if there is "pervasive involvement of a single core conspirator, or hub character." Mangual-Santiago, 562 F.3d at 422 (citation modified) (quoting United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999)).  Here, both parties agree, and the evidence reflected, that García was the "single core conspirator" or "hub character" who had pervasive involvement in the charged conspiracy. See id. García: (1) made the successful pitch to "invest" Mayagüez's trauma center funds; (2) worked with Stephen, Joseph, and Minger to create the investment or bank accounts needed to transfer those funds to his and his coconspirators' corporate entities; (3) directed payments, from the funds funneled to TEGA, to Irizarry and Riera's corporate entities; (4) instructed Irizarry and Riera to falsify invoices to justify those payments; (5) held private

- 17 -

meetings with Irizarry, Mejill, and Riera; and, (6) with those three men, attempted to conceal the scheme from the Mayagüez auditors. With ample evidence of García's pervasive involvement in all facets of the scheme -- from inception to disbursement to attempted coverup -- a reasonable jury could have concluded that there was overlap in the charged conspiracy.

Still, Irizarry disputes the existence of overlap, asserting that "[e]vidence that García interacted with all the defendants is not evidence that Irizarry knew about or overlapped with the other defendants." For support, he relies on United States v. Monserrate-Valentín, in which we stated that "the mere fact that a central person (the 'hub' of a wheel) is involved in multiple conspiracies (the wheel's 'spokes') does not mean that a defendant . . . who participated in a spoke conspiracy, may be convicted of participating in an overarching conspiracy encompassing the entire wheel." 729 F.3d 31, 44-45 (1st Cir. 2013) (citation modified) (quoting United States v. Franco-Santiago, 681 F.3d 1, 11 (1st Cir. 2012), abrogated on other grounds by Musacchio v. United States, 577 U.S. 237 (2016)). We went on to explain that, in that circumstance, "[t]he government must also produce 'evidence from which a jury could reasonably infer that the spoke defendant knew about and agreed to join any larger overarching conspiracy.'" Id. at 45 (quoting Franco-Santiago, 681 F.3d at 11).

But it is unclear how the portion of Monserrate-Valentín that Irizarry invokes negates our overlap determination. In that case, we did not opine whether the evidence the government proffered as to the hub character was sufficient to satisfy the overlap factor. See id. at 44-45. Nor did we alter our general rule that overlap may be satisfied if there is "pervasive involvement of a single core conspirator, or hub character." Mangual-Santiago, 562 F.3d at 422 (1st Cir. 2009) (citation modified) (quoting Portela, 167 F.3d at 695). Here, as we explained above, and contrary to Irizarry's assertions, the evidence of García's coordination of the scheme and interactions with the coconspirators (i.e., pervasive involvement in the charged conspiracy) supports a finding that the overlap factor is satisfied. See Abdelaziz, 68 F.4th at 53 (noting that the core conspirator "and his associates' interactions with the parents" satisfied the overlap factor).

Moreover, while it is true that the government must produce "evidence from which a jury could reasonably infer that the spoke defendant knew about and agreed to join any larger overarching conspiracy," the government has produced exactly that. Monserrate-Valentín, 729 F.3d at 45 (quoting Franco-Santiago, 681 F.3d at 11). The evidence showed that Irizarry incorporated U.A. in March 2016, just around the time García coordinated with the Kirkland brothers to move the $9 million into MEDI's UBIS account.

Then, a mere two days after $900,000 of the $9 million was transferred from the UBIS account to TEGA, U.A. received the first of several large payments from TEGA. The trial testimony revealed that Irizarry did not provide services in exchange for TEGA's payments to U.A., that he followed García's instruction to fabricate invoices justifying those payments, and that he knew those payments derived from the $9 million "investment" of which Mayagüez should have been the sole benefactor. And, while undertaking those actions, Irizarry joined García, Mejill, and Riera's efforts to convince the auditors that the $9 million had been legally invested for Mayagüez's benefit and need not be recovered. And, lastly, throughout the year Irizarry and the other charged coconspirators' companies were receiving money derived from the $9 million, Irizarry met frequently with García -- the "hub" or "core" person of the conspiracy -- and met in a group with García, Mejill, and Riera in private. When viewing all this evidence in a light most favorable to the verdict, a reasonable jury could infer that Irizarry not only knew about the overarching conspiracy to defraud Mayagüez and MEDI but also agreed to join that conspiracy.

Accordingly, with the totality of the evidence and the common goal, interdependence, and overlap factors weighing in the government's favor, we find that the evidence at trial was sufficient to prove the single wire fraud conspiracy charged in

Count One and Irizarry's knowledge of and agreement to participate in it. Such sufficient evidence for Count One means "there was no variance, let alone a prejudicial variance, as to this count," Vavic, 139 F.4th at 34, so we reject Irizarry's prejudicial variance argument. And, finally, because Irizarry's sufficiency challenge to the wire fraud conspiracy conviction fails, his derivative sufficiency challenges to his substantive wire fraud and money laundering convictions fail as well.

## B. Sentence Reduction Challenge

Lastly, Irizarry contends that the district court erred when it denied his motion for a sentence reduction under 18 U.S.C. § 3582(c)(2) -- which permits such a motion when a defendant "has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission . . . ." He asserts that his sentence should be reduced under § 3582(c)(2) because there is no evidence he personally caused substantial financial harm to Mayagüez. The government counters that the court lacks jurisdiction to review the district court's denial of Irizarry's § 3582(c)(2) claim because he has not filed a notice of appeal as to that denial. It asserts that where "the defendant's sole notice of appeal predates and fails to encompass the order he seeks to challenge, this

[c]ourt lacks jurisdiction and must decline to consider that challenge."

We agree with the government that we lack jurisdiction to hear an appeal of the denial of Irizarry's motion to reduce sentence. "To secure appellate review of a judgment or order, a party must file a notice of appeal from that judgment or order." Manrique v. United States, 581 U.S. 116, 120 (2017). While we retain discretion to "overlook defects in a notice of appeal," we "may not overlook the failure to file a notice of appeal at all." Id. at 125 (emphasis added); see also Fed. R. App. P. 3(a)(2).

Here, Irizarry does not dispute that he did not file a notice of appeal from the district court's order denying his motion to reduce his sentence. Thus, without such filing, we lack jurisdiction to consider his challenge to that order.

## IV. Conclusion

For the above reasons, we **affirm** Irizarry's wire fraud conspiracy, wire fraud, and money laundering convictions and **dismiss**, without prejudice, his appeal of the district court's order denying his motion to reduce his sentence.